EDITH H. JONES and JENNIFER WALKER ELROD, Circuit Judges,
dissenting, joined by JOLLY, SMITH and CLEMENT, Circuit Judges.
Three opinions have been written, each of which holds unconstitutional the City of Farmers Branch Ordinance 2952 (“the Ordinance”), which would establish a licensing regime for the rental of single-family homes and apartments in the City, and thereby seeks to discourage illegal immigrants from residing there. Two of the opinions (Reavley, J. and Dennis, J.) assert essentially that the Ordinance is incompatible with the national government’s exclusive authority to regulate foreign relations and immigration. The third (Higginson, J.) purports to find narrower conflicts between the Ordinance’s “criminal” enforcement and judicial review provisions and federal law prohibiting the “harboring” of illegal aliens, 8 U.S.C. § 1324(a)(l)(A)(iii), and federal removal procedures, before holding these provisions non-severable from the rest of the Ordinance.
The Ordinance was passed during a period of intense national debate concerning *562 the fate of millions of people present in this country who entered without passing official inspection or who overstayed visas or entry permits. A court does not have the luxury of entering into this debate, nor may we judge the wisdom of a local law. Villas at Parkside Partners v. City of Farmers Branch, 675 F.3d 802, 826, 831 (5th Cir.2012) (Elrod, J., dissenting). Our responsibility is to determine whether the Ordinance accords with principles of federalism, the Supremacy Clause, and relevant Supreme Court decisions. We would hold that it does. In an opinion just issued concerning a nearly identical local law, the Eighth Circuit agreed with us. Keller v. City of Fremont, 719 F.3d 931, 2013 WL 3242111 (8th Cir. June 28, 2013).
We first highlight aspects of the Ordinance that have been neglected or mischaracterized in the three opposing opinions. We then address the standards of appellate review, which have also been shortchanged by those opinions. Next, preemption principles are applied to the Ordinance’s licensing provisions. Finally, we analyze the conflict preemption and severability arguments raised by the Higginson opinion.
Our conclusions may easily be summarized. The Ordinance represents an exercise of the “police power” inherent in every self-governing community to make laws perceived beneficial to its citizens. It is thus entitled to a presumption of constitutionality according to every recent Supreme Court case dealing with local regulations that touch on the presence of illegal aliens.
The Ordinance does not constitute a regulation of immigration and thus is not preempted by the Constitution’s structure.
There is no “field preemption” of this Ordinance by federal immigration or foreign relations law. Otherwise, the recent Supreme Court opinions would neither have approved some local regulations bearing on immigrants nor gone to such lengths to explain precise conflicts between those regulations and federal law. See Keller, 719 F.3d at 940-43, 2013 WL 3242111, at *3-7.
The Ordinance’s licensing and fines provisions do not conflict with federal law. The Ordinance does not conflict with any positive federal law governing the housing of illegal aliens, as no such law exists.
The Ordinance does not conflict directly with or serve “as an obstacle” to (a) the federal law against “harboring” illegal aliens, (b) federal procedures for removing illegal aliens from the United States, or (c) other provisions alluded to in the Higginson opinion. See id. at 943 — 46, 2013 WL 3242111, at *7-9.
Finally, because the Ordinance’s provisions setting fines and authorizing judicial review are readily severable from its licensing regime, the Higginson opinion’s conclusion of non-severability fails logically and under Texas law.
I. The Ordinance
The Ordinance is outlined in the Higginson opinion, but several features should be emphasized. The licensing regime applies to all landlords and renters of apartments and single family residences, whether citizens or not. Any applicant for a rental license receives one automatically by either verifying citizenship or legal residence or by asserting he does not know whether he has a relevant federal “number” identifying legal presence.[1] Farmers Branch, Tex., Ordinance 2952, §§ 1(B)(6), *563 3(B)(6). For a non-citizen applicant, the city building inspector conducts an inquiry with federal authorities to determine whether the renter is lawfully present in the United States. Id. §§ 1(D)(1), 3(D)(1). The federal government is obliged by law to respond to the inquiry, as it routinely responds to similar inquiries by all manner of local agencies and law enforcement. 8 U.S.C. § 1373(c).[2] The building inspector is bound to abide by the response. If the federal government states that the alien is lawfully present, or if the federal government’s records reveal uncertainty about the alien’s status, the applicant retains a license. No further action is taken by the building inspector until the federal government provides final verification concerning the immigration status of the occupant or requests additional information. Ordinance 2952, §§ 1(D)(3), 3(D)(3).
Only if the federal government states that the renter is not lawfully present does the building inspector pursue the inquiry. Id. §§ 1(D)(2), 3(D)(2). The Ordinance then provides the renter and the landlord an additional 60 days to clarify the alien’s status. Id. After the 60th day, if the building inspector remains unsatisfied with the explanation, the inspector may again contact the federal government. The Ordinance allows revocation of the occupancy license only if the federal government again reports that the individual is “an alien who is not lawfully present in the United States.” Id. at §§ 1(D)(4), 3(D)(4).
After this second verification from the federal government that the renter is “not lawfully present in the United States,” the building inspector must send a revocation notice to the renter and lessor. Id. Fifteen days after the revocation notice is issued, the previously valid residential occupancy license is revoked. Id.
After the renter’s residential occupancy license has been revoked, the Ordinance specifies that the landlord commits an offense if it fails to initiate proceedings to terminate the lease. Id. §§ 1(C)(7), 3(C)(7). Any renter who applied for and received a valid residential occupancy license that the building inspector later revokes has not committed any offense, even if the renter continues to reside in the rental premises after the license is revoked.[3] See id. §§ 1(C), 3(C).
A conviction for violating the Ordinance is punishable by a fine not to exceed $500 for each day of an ongoing violation of the Ordinance. Id. § 5.
The Ordinance specifies that it “shall be applied uniformly, and enforcement procedures shall not differ based on a person’s race, ethnicity, religion, or national origin.” Id. §§ 1(D)(9), 3(D)(9).
Judicial review may be sought by any landlord or renter, but not by the City. Id. §§ 1(E), 3(E). The state court is bound by “any conclusive determination of immigration status by the federal government,” and the most recent determination of immigration status by the federal government “shall create a rebuttable presumption as to the individual’s immigration status.” Id. §§ 1(E)(4) & (5), 3(E)(4)(5). Finally, the Ordinance “shall *564 be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens, nationals, and aliens.” Id. §§ 1(F), 3(F).
To insulate the Ordinance against legal invalidation, there is a severability clause. Id. § 6.
A few obvious facts surrounding the Ordinance should also be noted. It does not apply to the purchase of residences or apartment houses or any other real estate within Farmers Branch. Cf. id. § 1 (regulating single-family rental housing); § 3 (regulating apartment complex rentals). It does not apply to illegal aliens who are visitors in rental housing. Id. §§ 1(A)(5), 3(A)(5). It does not apply to hotels, suite-hotel residences, or motels. It does not apply to shelters where illegal aliens do not reside as tenants. It does not affect the hiring or employment of illegal aliens. The Ordinance, therefore, is far from banning illegal aliens from the City of Farmers Branch. The City’s enforcement of the Ordinance in no way affects the federal government’s decision whether to remove any illegal alien, nor does it effect any alien’s removal from the United States.
II. Standards of Review/Relevant Preemption Principles
The ultimate issue in this case is whether the district court correctly determined that federal law preempts the Ordinance. The district court’s preemption determination presents “a question of law that we review de novo.” See Franks Inv. Co. LLC v. Union Pac. R.R. Co., 593 F.3d 404, 407 (5th Cir.2010) (en banc) (citation omitted). That standard, however, is only the beginning of the analytical rules we must apply. The nature of the Appellees’ lawsuit — a facial, prospective challenge — and the character of the Ordinance — a housing regulation that falls within the City’s police power — necessarily affect our analysis.
A. Salerno Principle Regarding Facial Challenges
That the Appellees waged a facial, prospective challenge to the Ordinance invokes standards of judicial restraint designed to further the interests of federalism and deference to duly passed legislation. See Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 451, 128 S.Ct. 1184, 1191, 170 L.Ed.2d 151 (2008) (recognizing that facial challenges are generally disfavored because they “threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution”).
Pursuant to United States v. Salerno, the Ordinance should not be held facially unconstitutional in toto unless “no set of circumstances exists under which the Act would be valid.” 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987) (emphasis added); see also Anderson v. Edwards, 514 U.S. 143, 155 n. 6, 115 S.Ct. 1291, 1298 n. 6, 131 L.Ed.2d 178 (1995) (applying the Salerno standard in a preemption case); Cal. Coastal Comm’n v. Granite Rock Co., 480 U.S. 572, 593, 107 S.Ct. 1419, 1431, 94 L.Ed.2d 577 (1987) (“To defeat Granite Rock’s facial challenge, the Coastal Commission needed merely to identify a possible set of permit conditions not in conflict with federal law.”).[4] Under Salerno, if there are any permissible applications of the Ordinance, we should not *565 completely invalidate it on the basis of a facial challenge.
Moreover, concomitant with Salerno, the City should have been given the opportunity to narrow the Ordinance, if needed, during the course of its enforcement activity or in judicial proceedings. DeCanas v. Bica, 424 U.S. 351, 363-64, 96 S.Ct. 933, 940-41, 47 L.Ed.2d 43 (1976) (explaining that the petitioners conceded part of the California regulation was unconstitutional on its face, but recognizing that the state could give the provision a limiting construction and therefore leaving it for the state courts to later decide in the first instance whether the provision would conflict with federal law). Unfortunately, the three opposing opinions fail to heed, much less apply, these limits on our review powers. They invalidate the Ordinance without acknowledging its valid application to citizens and legally resident aliens.
B. The Ordinance Is Within the Police Power
The Ordinance, correctly viewed, falls within the traditional police power of the City to regulate housing by means of licensing.
Historically, the police power extends to whatever measures a polity chooses to enact to protect, preserve, and enhance the lives of its citizens. See Gonzales v. Oregon, 546 U.S. 243, 270, 126 S.Ct. 904, 923, 163 L.Ed.2d 748 (2006) (describing the police power as legislation related to “the protection of the lives, limbs, health, comfort, and quiet” of the citizenry (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 475, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996))). The police power extends so far as to include rent controls; building codes that regulate for the sake of safety or aesthetics; and excluding certain establishments, from liquor stores to topless clubs, from various areas. See, e.g., Pennell v. City of San Jose, 485 U.S. 1, 11-12, 108 S.Ct. 849, 857-58, 99 L.Ed.2d 1 (1988) (permitting extensive rent and price controls as “legitimate exercise of ... police powers”).
The police power no doubt empowers Farmers Branch to enact a licensing regime to exclude child predators from living in multifamily apartment complexes, and it would enable the City to ban federal or state fugitives from justice from residing in the community. See, e.g., United States v. Morrison, 529 U.S. 598, 618, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000) (“Indeed, we can think of no better example of the police power ... than the suppression of violent crime and the vindication of its victims.” (footnote and citations omitted)); Erznoznik v. City of Jacksonville, 422 U.S. 205, 212, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975) (describing city’s “police power to protect children” as “undoubted”); see also Nollan v. Cal. Coastal Comm’n, 483 U.S. 825, 843, 107 S.Ct. 3141, 3152, 97 L.Ed.2d 677 (1987) (“It is also by now commonplace that this Court’s review of the rationality of a State’s exercise of its police power demands only that the State ‘could rationally have decided’ that the measure adopted might achieve the State’s objective.” (quoting Minnesota v. Clover Leaf Creamery Co., 449 U.S. 456, 466, 101 S.Ct. 715, 725, 66 L.Ed.2d 659 (1981))). It would seem to follow that the City’s power to deter illegal aliens from renting qualifies as an exercise of the police power, so long as no invidious discrimination occurs.[5]
*566 Characterizing the Ordinance as not within the incredibly broad reach of the City’s police power, as two of the opposing opinions would do, is a very novel idea, unsupported by any Supreme Court authority. On the contrary, the Supreme Court confirmed that “California’s attempt ... to prohibit the knowing employment by California employers of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the mainstream of such police power regulation.” DeCanas, 424 U.S. at 356, 96 S.Ct. at 937 (emphasis added). The same conclusion applies for housing regulations touching illegal aliens.
C. Presumption of Constitutionality
Because the Ordinance involves the local police power, it is entitled to a strong presumption of constitutionality. This presumption operates generally in federal preemption law. See, e.g., Wyeth v. Levine, 555 U.S. 555, 565, 129 S.Ct. 1187, 1194-95, 173 L.Ed.2d 51 (2009); Altria Group, Inc. v. Good, 555 U.S. 70, 76-77, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008). It operates specifically in cases where local regulations within the police power are asserted to be preempted by federal immigration law. In DeCanas, the Supreme Court treated a California statute that criminalized the hiring of illegal aliens as a regulation of employment and would not presume that Congress “intended to oust state authority to regulate the employment relationship covered by [the California statute] in a manner consistent with pertinent federal laws.” DeCanas, 424 U.S. at 357, 96 S.Ct. at 938. Likewise, in Arizona v. United States, — U.S.-, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012), the Court held that when conducting preemption analysis, “courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress.” Id. at 2501 (internal quotations and citations omitted); see also Chamber of Commerce of U.S. v. Whiting, — U.S.-, 131 S.Ct. 1968, 1983, 179 L.Ed.2d 1031 (2011) (declining to preempt state law dealing with a traditional area of state concern); Doe v. Plyler, 628 F.2d 448, 452-53 (5th Cir.1980), aff'd on other grounds sub nom. Plyler v. Doe, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (upholding charge of $1000 for education of illegal immigrants’ children in public schools). Unfortunately, none of the three opposing opinions accords the Ordinance this strong presumption, although Judge Higginson refers to it in his separate concurrence.
D. Preemption Rules
With these background rules set, the principles of federal preemption may be briefly summarized. The Supremacy Clause holds the Constitution and acts of Congress to be supreme, displacing contrary state or local legislation “where there is an actual conflict between the two sets of legislation such that both cannot stand.” 2 Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law: Substance and Procedure § 12.1 (4th ed.2007). In Arizona, the Supreme Court explained that federal law may preempt local law by an express statutory provision; by field preemption, Congress’s placing a field within the “exclusive governance” of federal law; or by conflict preemption when state law actually conflicts with federal law. Arizona, 132 S.Ct. at 2500-01. Regarding field preemption, the Court cautioned in DeCanas: “[fjederal regulation ... should not be deemed preemptive of state regulatory power in the absence of persuasive reasons either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.” 424 U.S. at 356, 96 S.Ct. at 937 (alterations in original) (quoting Fla. Lime & Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, *567 1217, 10 L.Ed.2d 248 (1963)). Consequently, in Arizona, the Court narrowly defined the field of “alien registration.” 132 S.Ct. at 2502. A local law conflicts with federal law either when compliance with both regulations “is a physical impossibility” or when the local law “stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.” Arizona, 132 S.Ct. at 2501 (quoting Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)).
III. The Ordinance’s Licensing Provisions
The Reavley and Dennis opinions express similar grounds for their conclusions that the Ordinance is wholly preempted. The Reavley opinion states: “Whether the Farmers Branch ordinance is preempted as an obstacle to the purposes and objectives of Congress in the field of immigration is a ‘matter of judgment’ informed by the federal scheme and the purpose and effects of the federal statutes as a whole.” Reavley Op. at 540 (citation omitted). The Dennis opinion concludes that “the Ordinance infringes on and conflicts with comprehensive and exclusively federal schemes for classifying noncitizens and with enforcing and adjudicating the implications of those federal classifications,” and “thus stands as an obstacle to the full achievement of the purposes and objectives of uniform federal immigration law.” Dennis Op. at 549. The reasoning of the two opinions frequently uses field preemption language, although both also speak of obstacle preemption. Neither opinion identifies any specific conflict between the Ordinance’s licensing provisions and federal law. Both opinions seem open to the interpretation that the primacy of the national interest in enforcing uniform immigration regulations leaves no room whatsoever for “local experimentation that deviates from ‘the system Congress created.’” Dennis Op. at 549 (citing Arizona, 132 S.Ct. at 2506-07).
We are thus required to address three separate arguments: (1) the Ordinance is a regulation of immigration wholly outside state or local government powers under the Constitution; (2) the Ordinance is preempted because Congress “occupied the field” of alien housing through its web of regulations governing aliens’ admission and duration of stay in this country; and (3) the Ordinance impliedly conflicts with and stands as an obstacle to the enforcement of federal immigration laws.[6] We address and refute each argument in turn.
A. Constitutional Preemption
It is asserted that the Ordinance amounts to a “regulation of immigration” because preventing illegal aliens from renting apartments or single family dwellings in Farmers Branch is tantamount to determining that they may not reside within the United States. If this assertion were accurate, it would be a bold holding. Regulation-of-immigration preemption derives directly from the Constitution, which confers on the federal government the power to conduct foreign relations and to promulgate a “uniform Rule of Naturalization,” U.S. Const, art. I, § 8, cl. 4, and vests exclusive control over the “authority to control immigration — to admit or exclude aliens — ... solely in the Federal government.” Takahashi v. Fish & Game Comm’n, 334 U.S. 410, 415, 68 S.Ct. 1138, 1141, 92 L.Ed. 1478 (1948). State laws imposing on the federal “authority to control immigration” are a “constitutionally proscribed regulation of immigration that *568 Congress itself would be powerless to authorize or approve.” DeCanas, 424 U.S. at 355-56, 96 S.Ct. at 936. Even Congress could not delegate this power to the state or local governments.
In DeCanas, however, the Court rejected — in a single paragraph — reasoning similar to that in the Reavley and Dennis opinions. Justice Brennan, writing for a unanimous Court, declared that it “never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised.” 424 U.S. at 355, 96 S.Ct. at 936 (emphasis added). The Court cited to a string of cases upholding “certain discriminatory state treatment of aliens lawfully within the United States.” Id. Those cases “remain authority that, standing alone, the fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." Id. (emphasis added). The Court rejected the California court’s underlying assumption that a labor regulation targeting illegal aliens was a “regulation of immigration,” explaining that “there would have been no need ... even to discuss the relevant congressional enactments in finding pre-emption of state regulation if all state regulation of aliens was ipso facto regulation of immigration.” Id. The Court depicted the California law at issue as a labor law “imposing criminal sanctions against state employers who knowingly employ aliens who have no federal right to employment within the country.” Id.
The Reavley and Dennis opinions do not, because they cannot, demonstrate that the Ordinance runs afoul of the test in DeCanas. The Ordinance does not determine the entry or exit of anyone into or out of the United States. It does not determine the conditions under which a “lawful” immigrant may remain. And the Ordinance’s grants or denials of rental licenses are designed to follow and correspond with federal determinations concerning each applicant. This should be the end of the constitutional preemption issue.
Nevertheless, the Reavley opinion implies that the Ordinance is an immigration regulation because it may force illegal aliens to relocate from certain rental housing in Farmers Branch. This view is inconsistent with authority from the Supreme Court, this court, and the Eighth Circuit in Keller.[7] The Court has upheld state statutes that, respectively, criminalized the knowing employment of illegal aliens and effectively forced them to relocate if they wish to be employed. Whiting, 131 S.Ct. at 1973; DeCanas, 424 U.S. at 355-56, 96 S.Ct. at 936-37. This circuit has held that a Texas statute denying free public education to illegal immigrant children was not preempted by federal law. See Plyler, 628 F.2d at 451-54.[8] Certainly, *569 excluding one’s children from free public education would be a deterrent to illegal aliens’ remaining in Texas, although it would not affect their residence elsewhere in the country.
To the extent the Reavley and Dennis opinions would hold the Ordinance an invalid “regulation of immigration” because the intent of the local legislators was to reinforce federal alien removal laws, the Supreme Court has rejected their arguments:
Although the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government, unchecked unlawful migration might impair the State’s economy generally, or the State’s ability to provide some important service. Despite the exclusive federal control of this Nation’s borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns.
Plyler, 457 U.S. at 228 n. 23, 102 S.Ct. at 2400 n. 23 (emphasis added) (citing DeCanas, 424 U.S. at 354-56, 96 S.Ct. at 935-36). In disregard of this language, the Reavley and Dennis opinions would hold that states are powerless “to deter the influx” because any local law having such a purpose or effect would be an impermissible regulation of immigration. The ultimate proof of these opinions’ error is the plain fact that, despite having ruled three times on preemption issues arising from local laws that affected illegal aliens, the Court has refused to treat any of them as constitutionally impermissible regulations of immigration. See generally Arizona, 132 S.Ct. 2492; Whiting, 131 S.Ct. 1968; DeCanas, 424 U.S. 351, 96 S.Ct. 933.[9]
B. Field Preemption of Licensing Provisions
Field preemption ■ differs from preemption by constitutional design because it depends on affirmative Congressional acts to “occupy the field” sought to be regulated. See Gade v. Nat’l Solid Wastes Mgmt. Ass’n, 505 U.S. 88, 115, 112 S.Ct. 2374, 2392, 120 L.Ed.2d 73 (1992) (Souter, J., dissenting) (“Field pre-emption is wrought by a manifestation of congressional intent to occupy an entire field.... ” (citation omitted)). The Reavley and Dennis opinions both refer to field preemption. See Reavley Op. at 543 (“Congress has occupied the field of alien removal.”); Dennis Op. at 549 (“If § 3 of the Arizona statute were valid, every State could give itself independent authority to prosecute federal registration violations....” (quoting Arizona, 132 S.Ct. at 2502)). Their conclusions apparently hinge on the proposition *570 that a municipal law requiring licenses for all renters and revoking them from illegal immigrants is sufficiently analogous to federal “removal procedures,” which are “the sole and exclusive procedure for determining whether an alien may be ... removed from the United States.” 8 U.S.C. § 1229(a)(3).
The premise of this argument is wrong, however, because it conflicts with the Supreme Court’s incontrovertible explanation of the “field” of removal proceedings. “A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States.” Arizona, 132 S.Ct. at 2506. Taken together, DeCanas, Whiting and Arizona demonstrate how narrow the scope of field preemption is regarding local legislation that concerns illegal aliens. De-Canas rejected the contention that denying illegal aliens employment in California was the same as attempting to “remove” them,, despite the practical consequence that lack of employment opportunities is an insuperable barrier to continued presence. See 424 U.S. at 356-63, 96 S.Ct. at 936-40. Whiting represents a corresponding decision not to hold that Congress “occupied the field” vis-a-vis the revocation of state business licenses that would befall Arizona businesses that hired illegal aliens. See 131 S.Ct. at 1977-87.
Finally, in Arizona, at most two provisions of SB 1070 were declared in conflict with a carefully defined “field” within immigration law. 132 S.Ct. at 2501-10. Section 3 of the bill allowed the arrest of aliens not carrying federal identification cards. Id. at 2501. The provision was held to “intrude[] on the field of alien registration,” id., a topic Congress had reserved to itself. See Hines v. Davidowitz, 312 U.S. 52, 74, 61 S.Ct. 399, 408, 85 L.Ed. 581 (1941). Separate state enforcement of federal registration rules could “frustrate federal policies” by allowing criminal charges against individuals for federal violations where the officials “in charge of the comprehensive scheme” of registration determined no prosecution should occur. Arizona, 132 S.Ct. at 2503. Like § 3, another provision of the Arizona law— § 6 — enabled local law enforcement to effect a warrantless arrest “if the officer has probable cause” to believe the arrestee has committed an offense rendering him “removable from the United States.” Id. at 2505. Whether the Court held § 6 field or conflict preempted is somewhat unclear. Assuming that the Court’s ruling was based on field preemption, its concern was local government overlap with the “field” of alien removal from this country; the provision “violate[d] the principle that the removal process is entrusted” to federal discretion. Id. at 2506. Thus, it “attempted] to provide state officers even greater authority to arrest aliens on the basis of possible removability than Congress has given to trained federal immigration officers.” Id.
Arizona is consistent with DeCanas and Whiting while distinguishable from this case. Although the Court held at most two sections field-preempted, another— § 2(B) — was provisionally upheld, id. at 2507-10, and a fourth— § 5(C) — was overturned on conflict preemption alone. Id. at 2503-05. As in previous cases, the Court was cautious in using the broad proscription of local authority that inheres in field preemption. Moreover, § 3 and § 6 of Arizona SB 1070 were intended to employ local law enforcement not for purposes of enforcing a local ordinance, but solely to assist federal officers in removing illegal aliens from this country. The Ordinance has no similar intent or mechanism. It is not field preempted.
C. Conflict Preemption of Licensing Provisions
Conflict preemption may arise from a specific legislative command, from the im *571 possibility of compliance with both federal and local law, or from the local law’s obstruction of the means and purposes of federal regulation. See Arizona, 132 S.Ct. at 2500-01. The Reavley and Dennis opinions rely on “obstacle” preemption, as they must. That is because Congress has passed no expressly preemptive provision concerning illegal alien housing, and no federal law affirmatively regulates where aliens who are illegally present in the United States may live.[10] Consequently, neither express nor impossibility preemption is at issue here. These opinions instead focus broadly on the Ordinance’s alleged conflict with federal alien removal procedures, the complexity of alien classifications, and the considerable discretion entrusted by law to federal immigration officials. Although both opinions cite Arizona extensively, neither one mentions Whiting, in which the Supreme Court only two years ago held that an Arizona law requiring employers to verify their employees’ lawful immigration status does not pose an obstacle to the enforcement of federal immigration policy. Whiting, 131 S.Ct. at 1985-87. This case should be controlled by the Whiting implied preemption analysis.
Setting the stage for our conclusion are several facts about the Ordinance that the Reavley and Dennis opinions minimize. First, the Ordinance does not effect or affect illegal aliens’ removal by deportation or otherwise from the United States. Second, the Ordinance is not a parallel enforcement scheme to assist the federal government in initiating or completing formal detention or removal proceedings. Rather, it is a licensing law that governs a subset of property owners and prospective tenants in Farmers Branch. Although illegal aliens’ rental licenses may be revoked, the Ordinance contains no device by which a local government official may remit the alien to federal custody or attempt to compel the federal government to act against the alien for removal purposes. Third, enforcement of the Ordinance depends solely on two federal affirmations, rendered at least sixty days apart, that an alien is not lawfully present in the United States. The building inspector may not independently decide a renter’s lawful status.
Furthermore, the federal government is required by law to respond to the City’s inquiries. 8 U.S.C. § 1373(c).. One, but not necessarily the only,[11] system that the City may use is the federal Systematic Alien Verification for Entitlements (“SAVE”) System. If the federal government renders an opinion that the alien is lawfully present or that his status is unresolved in some way, the rental license may not be revoked. The Ordinance thus overcompensates, rather than undercompensates, for the possibility that a renter is unlawfully present but not removable. Certainly it is not facially inconsistent with federal status determinations.
In Whiting, the Supreme Court upheld an Arizona law requiring employers to verify the immigration status of their employees and revoking the employers’ business licenses for willful violations. The Supreme Court disposed of the contention that insofar as they concerned alien employment, the Arizona regulations intruded on a “uniquely federal area[] of regulation” by “upset[ting] the balance” Congress struck when it passed (post-DeCanas) specific legislation concerning alien *572 employment. Whiting, 131 S.Ct. at 1983, 1986-87 (Roberts, C.J., controlling opinion).[12] The Court found no inherent conflict between federal and state law because the Arizona law was merely “[r]egulating in-state businesses through licensing laws.” Id. at 1983. Similarly, the Ordinance here regulates local businesses through licensing laws. The Court also rejected the claim that the federal E-Verify system that employers use would not yield reliable answers concerning an alien’s work authorization:
The federal determination on which the State must rely is provided under 8 U.S.C. § 1373(c). That provision requires the Federal Government to “verify or ascertain” an individual’s “citizenship or immigration status” in response to a state request. Justice BREYER is concerned that this information “says nothing about work authorization.” Justice SOTOMAYOR shares that concern. But if a § 1373(c) inquiry reveals that someone is a United States citizen, that certainly answers the question whether that individual is authorized to work. The same would be true if the response to a § 1373(c) query disclosed that the individual was a lawful permanent resident alien or, on the other hand, had been ordered removed. In any event, if the information provided under § 1373(c) does not confirm that an employee is an unauthorized alien, then the State cannot prove its case.
Id. at 1982 (emphasis added) (internal citations omitted).
The dispositive answer to the concern about the Ordinance’s wrongful revocation of rental licenses and alleged inconsistency with federal determinations is that the building inspector “cannot prove his case” if a federal inquiry does not conclusively establish that the renter is “not lawfully present.”[13]
*573 Judge Reavley’s opinion also implies an infirmity in the Ordinance’s potential imposition of fines on illegal aliens for violating the licensing requirements. This implication is derived from the Supreme Court’s invalidation of § 5(C) of Arizona S.B. 1070, which criminalized illegal workers’ attempts to find employment. Arizona, 132 S.Ct. at 2503. The Court found a clear conflict between Arizona’s law and the federal Immigration Reform and Control Act (“IRCA”), which imposed various sanctions only on employers of illegal aliens. Id. at 2503-05. Further, the Arizona opinion shows that the legislative background of IRCA was critical to the Court’s decision. Id. at 2504. That legislative history demonstrated “that Congress made a deliberate choice not to impose criminal penalties on aliens” for seeking employment. Id. Because the Court viewed IRCA as containing Congress’s “considered judgment that making criminals out of aliens engaged in unauthorized work ... would be inconsistent with federal policy and objectives,” id., the state’s conflicting method of enforcement must be an “obstacle to the regulatory system Congress chose.” Id. at 2505. Judge Reavley consequently opines that “criminalizing” illegal aliens’ choice of housing similarly conflicts with Congress’s designated alien removal procedures.
This complaint is at too high a level of generality: Any local licensing regulation touching the immigrant status — for instance, the refusal to issue drivers’ licenses — could be said to conflict cosmieally with the goals of federal immigration law. More concretely, this view overlooks the preface to this part of the Arizona discussion, which acknowledged that, in DeCanas, the Court had approved “State ... authority to pass its own laws on the subject” “[wjhen there was no comprehensive federal program regulating the employment of unauthorized aliens.” Id. at 2503. No extant federal law regulates the housing of illegal aliens. There is thus no evidence of a deliberate congressional choice on the subject; if anything, we ought to infer congressional ambivalence from the fact that Congress passed no law concerning either “sanctuary cities” or, at the opposite pole, cities that have attempted to discourage influxes of illegal aliens.
The Court’s approach in DeCanas is more compelling here than Judge Reavley’s, for DeCanas recognized that “States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.” 424 U.S. at 356, 96 S.Ct. at 937. At the time of that decision, the federal government “had expressed no more than ‘a peripheral concern with [the] employment of illegal entrants.’ ” Arizona, 132 S.Ct. at 2503 (quoting DeCanas, 424 U.S. at 360, 96 S.Ct. at 939) (alteration in original). Relevant to this case, the federal government has expressed no more than a peripheral concern with aliens’ housing choices.
But Whiting stands as the most obdurate obstacle to the Reavley and Dennis opinions insofar as they assert conflict preemption of the Ordinance. Whiting held that “[r]egulating in-state businesses through licensing laws” that prohibited the knowing employment of illegal aliens, using means within the state’s police power, stands as no obstacle to the enforcement of federal immigration law, even to federal law dealing -with employers of illegal aliens.[14] 131 S.Ct. at 1983. The Court found that the mechanics of the Arizona *574 law were enacted to correspond with federal determinations of alien status. Id. at 1981-88. Thus, the state’s definition of “unauthorized alien” as an alien “not lawfully admitted for permanent residence,” or not otherwise authorized to be employed, adopted the federal definition. Id. at 1981. State investigators were not allowed independently to determine unauthorized status but were bound by the federal government’s determinations resulting from information furnished under 8 U.S.C. § 1373(c). Id. As a result, the Court held, “there can by definition be no conflict between state and federal law as to worker authorization, either at the investigatory or adjudicatory stage.” Id.
Rejecting general contentions that conflict preemption was required to maintain the “balance” Congress struck in enacting certain federal restrictions on illegal alien employment, the Court found inapplicable the cases that involved “uniquely federal areas of regulation,” because “[rjegulating in-state businesses through licensing laws has never been considered such an area of dominant federal concern.” Id. at 1983. Finally, as it noted, “[licensing suspension and revocation are significant sanctions. But they are typical attributes of a licensing regime.” Id.
We need not repeat the undisputed facts in the instant case to reinforce the analogy between the Ordinance and the Arizona law upheld in Whiting.
IV. Conflict Preemption of Criminal Provisions
The Higginson opinion turns principally on the view that fines can be levied on violators of the Ordinance. The potential criminal penalty for violations is a fine not to exceed $500, which qualifies it as a Texas Class C misdemeanor. Judge Higginson correctly notes that law enforcement officers may “arrest” and “detain” violators for such misdemeanor offenses, but this is rather overstated; Class C misdemeanors are not punishable by imprisonment and are typified by motor vehicle violation citations. Judge Higginson’s conclusion that the Ordinance is conflict preempted largely rests upon two theories: (1) the Ordinance “interfer[es] with federal anti-harboring law,” 8 U.S.C. § 1324(a)(A)(iii), and (2) the Ordinance “allow[s] state officers to ‘hold[ ] aliens in custody for possible unlawful presence without federal direction and supervision.’ ” Higginson Op. at 529. Moreover, because his opinion holds a severability clause ineffective to divorce the licensing provisions from the potential fines, the Higginson opinion would overturn the Ordinance in toto. While expressing an allegedly narrow rationale for decision, the Higginson opinion’s impact is as broad as that of the Reavley and Dennis opinions.
We disagree with the Higginson opinion’s interpretation of the Ordinance, with its conflict preemption analysis, and with its non-severability ruling. If the Higginson opinion fails on any one of these elements, the Ordinance must be upheld. We discuss each of these elements in turn.
A. Possible Criminal Offenses under the Ordinance
Carefully examined, the Ordinance does not “criminalize” illegal aliens’ presence in Farmers Branch, nor does it expose lessors to a duplicate penalty for “harboring” illegal aliens. The Higginson opinion misreads the actions that constitute offenses under the Ordinance.
1. Impact of Ordinance on Renters
Judge Higginson’s conclusion that law officers will be able to hold aliens in custody for possible unlawful presence is inaccurate under the plain terms of the Ordinance. Also, because the Ordinance does not penalize a tenant if he continues to *575 reside in a Farmers Branch rental after his residential occupancy license is revoked, there is no basis to conclude that the federal anti-harboring statute conflict-preempts the Ordinance as applied to renters.
A renter (ie., an individual who is possibly “not lawfully present”) can violate the Ordinance in only three ways:
(1) by occupying a leased or rented apartment before obtaining a valid occupancy license;[15]
(2) by “knowingly mak[ing] a false statement of fact on an application for a residential occupancy license,” Ordinance 2952, §§ 1(C)(2), 3(C)(2); or
(3) by “creating], possess[ing], sell[ing], or distributing] a counterfeit residential occupancy license.” Id. §§ 1(C)(3), 3(C)(3).
In none of these three circumstances is the renter’s lawful or unlawful immigration status relevant to potential fines. Instead, the Ordinance penalizes renters only in the first circumstance, when they fail to apply for a residential occupancy license.[16] Even if a renter is “not lawfully present,” he automatically receives a residential occupancy license when he applies for one and, therefore, does not commit an offense. Id. §§ 1(B)(6), 3(B)(6).
Critically, the Ordinance does not impose criminal liability on any renter after the renter applies for an occupancy license.[17] This is because the Ordinance does not penalize a renter for continuing to occupy rental housing after the City revokes a residential occupancy license.[18] Rather, if a license is revoked, the Ordinance makes only the lessor’s conduct an offense. In sum, at no time will the City— after determining that an individual is “not lawfully present” — be able to “arrest,” “detain,” or “fine” the renter.
*576 2. Impact of Ordinance on Lessors
Judge Higginson also contends that the Ordinance is conflict-preempted because “by criminalizing conduct that does not have the effect of evading federal detection, and by giving state officials authority to act as immigration officers outside the ‘limited circumstances’ specified by federal law, the Ordinance ‘interfere[s] with the careful balance struck by Congress’ with respect to the harboring of non-citizens here contrary to law.” Higginson Op. at 531 (quoting Arizona, 132 S.Ct. at 2505). Indeed, lessors who violate the Ordinance may be subject to fines for conduct that is not criminalized under 8 U.S.C. § 1324. On its face, then, the Ordinance does not overlap with the federal anti-harboring crime or retard the federal government’s exclusive prosecutorial discretion.[19]
To elaborate, lessors in Farmers Branch are potentially criminally liable under the Ordinance if: (1) they lease to individuals who never apply for or obtain a residential occupancy license; or (2) they continue to lease to individuals whose residential occupancy license has been revoked because they are “not lawfully present.” There is other potential liability relating to a lessor’s administrative duties under the Ordinance, such as maintaining a copy of the residential occupancy license of each known occupant of their properties. None of these violations would subject the lessor to criminal liability under § 1324.
First, a “prosecution” under the Ordinance for leasing to an individual who never applies for nor obtains a residential occupancy license would not rely, in any way, on the immigration status of the renter. Liability would be based solely on a failure to comply with the Ordinance’s licensing requirements. In contrast, a prosecution under § 1324 would necessarily focus on the immigration status of the renter and whether the other three elements of a § 1324 violation could be established.[20] The Higginson opinion charges that focusing on the licensing regime (rather than the immigration status of the individuals) *577 is a “distinction without a difference.” Higginson Op. at 535 n. 15. This characterization does not withstand closer scrutiny because the elements of the respective “crimes” evince no conflict.[21]
Second, a prosecution under the Ordinance for continuing to lease to an illegal alien whose residential occupancy license has been revoked could not trigger a federal anti-harboring prosecution. This violation could occur only after the renter completes an application. The application process requires a renter to provide his name and the address where he plans to reside. Therefore, even if the lessor continued to lease to the renter after the renter’s license was revoked, it would be impossible to establish that the lessor was “hiding” the illegal alien from detection as is required for an anti-harboring conviction. See United States v. Varkonyi, 645 F.2d 453, 459 (5th Cir.1981) (interpreting the statutory phrase “harbor, shield, or conceal” to imply that “something is being hidden from detection”). Instead, it would be public knowledge where the “not lawfully present” alien was residing.
As we have shown, the Ordinance does not provide for “arrest,” “detention,” or “prosecution” of illegal aliens, nor does it create the local equivalent of anti-harboring criminal offense. Without criminal prosecution as its pivot, the Higginson conflict analysis fails. Moreover, if there is doubt about the scope of the Ordinance’s criminal provisions, the Salerno principle shields the provisions from facial unconstitutionality, and elementary principles of judicial restraint would afford the state courts the first opportunity at construing the Ordinance.[22]
B. Flawed Conflict-Preemption Analysis
But even if we accept, counter-factually, Judge Higginson’s characterization of the Ordinance, his conflict-preemption analysis is seriously flawed.
On the most general level, the Higginson opinion embodies the troubling concept that a federal criminal statute, standing alone, can preempt local police power regulations. The fact that the federal government has chosen to criminalize the behavior of harboring illegal aliens does not *578 indicate Congress’s intent to prevent local authorities from legislating within their traditional spheres of concern. That Congress, for instance, has enacted criminal laws prohibiting certain sales and transfers of firearms has no implied preemptive impact on states’ regulation of firearms. That Congress enacted a federal crime of bank robbery does not prevent localities from applying local zoning laws to banks or prosecuting for embezzlement or robbery victimizing the bank. Dual sovereignty in our federal system envisions precisely the possibility of such overlapping regulations. Certainly, when both the states and federal government choose to regulate similar activity, there will be occasions when a local enforcement officer pursues a case that federal agents let go, and vice versa. But courts do not normally call this phenomenon “conflict preemption.” Instead, we call it “federalism.”
For implied conflict preemption to occur, a direct conflict with federal objectives must be shown. The Supreme Court has emphasized that “[ijmplied preemption analysis does not justify a ‘freewheeling judicial inquiry into whether a state statute is in tension with federal objectives’; such an endeavor ‘would undercut the principle that it is Congress rather than the courts that preempts state law.’ ” Whiting, 131 S.Ct. at 1985 (Roberts, C.J., controlling opinion) (quoting Gade, 505 U.S. at 111, 112 S.Ct. at 2390 (Kennedy, J., concurring in part and concurring in judgment)). Despite the Higginson opinion’s attempt, the conflict between the Ordinance and the federal crime of harboring illegal aliens is illusory.
In several ways, the rationale of the Higginson opinion was rejected by the Supreme Court in DeCanas, a case that arose when the California Labor Code was amended to prohibit the knowing employment of illegal aliens. The statute imposed a potential fine on employers between $200 and $500 for each offense. Among many arguments for preemption, the statute’s challengers asserted a conflict with the federal anti-harboring crime, which at that time expressly exempted from felony status “employment (including the usual and normal practices incident to employment).” DeCanas, 424 U.S. at 360, 96 S.Ct. at 939. Despite the exculpatory proviso, the Court declared this “at best evidence of a peripheral concern with employment of illegal entrants.” Id. The Court “admonished that ‘due regard for the presuppositions of our embracing federal system, including the principle of diffusion of power not as a matter of doctrinaire localism but as a promoter of democracy, has required us not to find withdrawal from the States of power to regulate where the activity regulated was a merely peripheral concern of the (federal regulation).’ ” Id. at 360-61, 96 S.Ct. at 939 (quoting San Diego Bldg. Trades Council, Millmen’s Union, Local 2020 v. Garmon, 359 U.S. 236, 243, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959)). In a footnote, the Court repeated:
Accordingly, neither the proviso to 8 U.S.C. § 1324(a) nor Congress’ failure to enact general laws criminalizing knowing employment of illegal aliens justifies an inference of congressional intent to pre-empt all state regulation in the employment area. Indeed, Congress’ failure to enact such general sanctions reinforces the inference that may be drawn from other congressional action that Congress believes this problem does not yet require uniform national rules and is appropriately addressed by the States as a local matter.
Id. at 361 n. 9, 96 S.Ct. at 939 n. 9.
The analogy with the holding of DeCanas is straightforward. The federal anti-harboring crime exhibits at best a peripheral concern with rental housing for illegal *579 aliens, while housing regulations are within the core powers of local government. Just as the Court in DeCanas could not infer Congressional intent to prevent state regulation from the existence of one federal criminal statute and the paucity of other federal law governing alien employment, we should not infer an intent to proscribe local housing regulations where no other evidence of federal statutory concern exists.[23] That DeCanas was a field preemption case and Judge Higginson asserts conflict preemption in this case is of no moment. For conflict preemption to exist, there must be a direct conflict with or impairment of the criminal anti-harboring statute. The analogy to DeCanas emphasizes the utter absence of a core relation, and thus the absence of the necessary conflict, between the federal crime and the Ordinance.
Moreover, contrary to the methodology of the Higginson opinion, DeCanas does not treat the California Labor Code provision as a “criminal” statute despite its enforcement by fines. The prohibition involved “state authority to regulate the employment relationship.” Id. at 357, 96 S.Ct. at 937. The Court also described California’s law as “fashioned to remedy local problems, and operating] only on local employers, and only with respect to individuals whom the Federal Government has already declared cannot work in this country.” Id. at 363, 96 S.Ct. at 940. Critically, the Higginson opinion succeeds only if it correctly classifies the Ordinance as an attempt to “arrest,” “detain,” and “prosecute” illegal aliens. But that is not the way DeCanas approached the issue, even though the California statute was passed with the intent to deter illegal aliens from working, and gaining the wherewithal to reside, in the state.
In departing from the commonsense De-Canas analysis, the Higginson opinion’s approach fundamentally mischaracterizes the Ordinance. It is a licensing-based regulatory program, just as the licensing of drivers is a regulatory program to foster, inter alia, road safety and vehicle insurance. No one characterizes drivers’ license regulations as principally “criminal” even though anyone, including an illegal alien, may be arrested, detained, and cited for a Class C misdemeanor for having no license or producing a license to which he is not entitled. No one characterizes local zoning regulations as “criminal” because fines may be imposed, if, for instance, a landlord knowingly rents a dwelling that fails to meet minimum habitability standards. All regulatory regimes must have enforcement mechanisms, but their object is to secure voluntary compliance. No doubt, Farmers Branch hopes that if it is finally permitted to enforce the Ordinance, landlords and renters will generally comply, and most illegal aliens will avoid obtaining rental licenses and make other housing choices. Penalties are the last, and usually a rare, step in enforcement *580 and must not be the tail wagging the dog for preemption purposes.
But even if the Ordinance’s enforcement provisions should be highlighted for purposes of conflict preemption analysis, they do not impinge on federal enforcement of immigration law, as the Higginson opinion contends. First, because the federal harboring statute has only limited, if any, preemptive power against a local licensing regime, the fact that landlords must submit to the regulation or be liable for a fíne involves no inherent conflict with the crime of “harboring.” Indeed, compliance is consistent with the intent of the anti-harboring statute to prevent concealment and shielding of illegal aliens from federal attention. Cf. United States v. Rubio-Gonzalez, 674 F.2d 1067, 1073 n. 5 (5th Cir.1982) (“Congress intended to broadly proscribe any knowing or willful conduct fairly within any of these terms [ (conceal, harbor, or shield) ] that tends to substantially facilitate an alien’s remaining in the United States illegally.” (emphasis added)); United States v. Chon, 713 F.3d 812, 819 (5th Cir.2013) (per curiam) (“Chon’s contention that he simply did not prevent illegal aliens from renting a room at the Gateway Hotel is belied by his [active] facilitation of their presence and his willingness to allow alien smugglers to rent rooms on behalf of groups of illegal aliens.”).
Second, the “arrest,” “detention,” and “prosecution” functions of local officers who may enforce the Ordinance do not collide with federal decisions regarding “removal” of illegal aliens. As has been explained, violators of the Ordinance may be detained only until they post bond for their fines.[24] They are not “removed” or subjected to potential removal from the United States, or even from Farmers Branch. This limited enforcement authority plays no role in the process whereby the federal government detains and exercises discretion in deciding whom to remove from the United States. Enforcing the Ordinance is thus quite different from the Arizona S.B. 1070 provision that, if upheld by the Supreme Court, would have authorized local law enforcement to arrest and detain persons suspected of being deportable solely to assist and encourage the federal removal efforts. The Court found preemption, holding that the enforcement of the immigration laws has been assigned by Congress to comprehensive federal regulation. Arizona, 132 S.Ct. at 2502. The Ordinance, in contrast, claims no impingement on determinations of who may remain in or be detained for deportation from this country.
The Higginson opinion also criticizes the Ordinance because the federal anti-harboring crime penalizes only the individual who harbors the illegal alien, while under his interpretation of the Ordinance, the alien may be penalized as well. The opinion seeks support from the Supreme Court’s rejection in Arizona of § 5(C) of S.B. 1070 that crafted a criminal sanction (up to $2500 fine and six months imprisonment) for an alien illegally seeking employment. The Court conducted a thorough analysis of this provision in the context of recent federal laws that regulate, to some degree, the employment of illegal aliens. In finding conflict preemption, the lynchpin of the Court’s reasoning was that “Congress made a deliberate choice not to impose criminal penalties on aliens who seek” employment. Id. at 2504. No similar argument can be made that Congress intended the anti-harboring statute to preempt local housing regulations or that Congress de *581 liberately excluded aliens from the scope of its non-existent regulations. We cannot properly infer Congressional intent from silence.
The Higginson opinion further asserts that the Ordinance “impermissibly allows for local officers to arrest and detain non-citizens based on a classification [“unlawful presence”] that does not exist in federal law.” Relying on generalities about immigration classifications and discretionary determinations, the opinion implies that rogue local officials will inflict “criminal” sanctions on aliens who might in fact be authorized to be in the United States. Like the Reavley and Dennis opinions, however, this fear simply overlooks the facts. The building inspector has no authority to decide immigration status independently. He must defer to the binding result of inquiries to federal officials, made on two occasions, at least sixty days apart, that a particular tenant licensee is not lawfully present in the United States. The building inspector’s inquiries are no different from those made by hundreds of local governments daily to the federal government to ascertain immigrants’ status and qualifications for benefits ranging from housing assistance to student loans to medical care and disability income. It is the federal government’s duty to get the answers right, not the building inspector’s uninformed prerogative to guess. Further, the term “unlawful presence” must have some meaning to the federal government, as that term, or closely related terminology, frequently appears in federal statutes and regulations. See supra note 13.[25] The Eighth Circuit pithily rejected this contention: “It seems obvious that, if the federal government will be unable to definitively report that an alien is ‘unlawfully present,’ then the rental provisions are simply ineffectual. Plaintiffs and the United States do not explain why a local law is conflict-preempted when the federal government has complete power to avoid the conflict.” Keller, 719 F.3d at 945, 2013 WL 3242111, at *8.
Finally, the Higginson opinion declares that the Ordinance allows state officers to “hold[ ] aliens in custody for possible unlawful presence without federal direction and supervision.” Higginson Op. at 535 (citing Arizona, 132 S.Ct. at 2509). If this were true, the Ordinance would fail under the reasoning of Arizona in regard to § 5(C) of S.B. 1070. But it is untrue, and significantly so. The illegal alien who might be held in “custody” if he attempted to rent in Farmers Branch without a license or who falsified the information used to get a license could be held in custody for one violation, and one alone: violating the Ordinance. He could only be held long enough to have a citation issued and to secure a bond for the potential fine. This is comparable to the alien’s being held, until he procures a bond for the fine, because he does not furnish a proper driver’s license. If local detention is improper in these circumstances without “federal direction and supervision,” then illegal aliens *582 would receive functional immunity from valid regulatory ordinances that citizens do not possess.
For all these reasons, even if the Ordinance’s criminal provisions are interpreted according to the Higginson opinion, they are not an obstacle to the enforcement of the anti-harboring crime or federal immigration removal decisions.
C. Severability of the “Criminal” Provisions
The Higginson opinion asserts that the Ordinance “lacks functional coherence without its criminal offense and penalty provisions ...,” and accordingly, the opinion disregards the Ordinance’s strong severability clause. The primary rationale in the Higginson opinion’s discussion is the incorrect assumption that the Ordinance’s provisions are so “interdependent” as not to be severable under Texas law. Rose v. Doctors Hosp., 801 S.W.2d 841, 844 (Tex.1990). As we have noted, the non-sever-ability determination is a sine qua non of the Higginson opinion. Unless the “criminal” provisions are non-severable, the Ordinance cannot be overturned in full. The opinion’s non-severability analysis fails, however, because it depends on the misreading and mischaracterization of the Ordinance at the heart of the Higginson opinion.[26]
Severability raises a question of Texas law. The Texas Supreme Court has explained the test for severability as follows:
When, therefore, a part of a statute is unconstitutional, that fact does not authorize the courts to declare the remainder void also, unless all the provisions are connected in subject-matter, dependent on each other, operating together for the same purpose, or otherwise so connected in meaning that it cannot be presumed the legislature would have passed the one without the other. The constitutional and unconstitutional provisions may even be contained in the same section, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point is not whether they are contained in the same section, for the distribution into sections is purely artificial; but whether they are essentially and inseparably connected in substance. If, when the unconstitutional portion is stricken out, that which remains is complete in itself, and capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected, it must stand.
*583 Id. (quoting W. Union Tel. Co. v. State, 62 Tex. 680, 634 (1884)).
Texas law is consistent that “[i]n the construction of statutes, if it can be lawfully done, it is the duty of the court to construe a statute so as to render it valid.” Id. (quoting Sharber v. Florence, 131 Tex. 341, 115 S.W.2d 604, 606 (1938)). When confronted with a statute that is unconstitutional in part, Texas courts routinely delete the portion of the statute that renders it unconstitutional, leaving the remaining aspects of the statute, so long as the remaining statute is “capable of being executed in accordance with the apparent legislative intent, wholly independent of that which was rejected.” Id.; see, e.g., Comm’n for Lawyer Discipline v. Benton, 980 S.W.2d 425, 441 (Tex.1998) (“The unconstitutionality of one part of a statute does not require us to invalidate the entire statute unless the unconstitutional provision is not separable from the remainder.”); Quick v. City of Austin, 7 S.W.3d 109, 117 (Tex.1998) (“If a reviewing court were to determine that one portion of a water control ordinance was invalid, the court would therefore be required to ‘modify5 the ordinance to delete the invalid portion if the remainder of the ordinance was complete in itself and capable of being executed in accordance with the apparent legislative intent.”).
The Ordinance states:
The terms and provisions of this ordinance are severable and are governed by Section 1-12 of the Code of Ordinances, City of Farmers Branch, Texas, as amended. If the application of this ordinance to any person, entity, or circumstance is invalid, the invalidity does not affect other applications of the ordinance that can be given effect without the invalid application, since the same would have been enacted by the City Council without regard to any such invalid application.
Ordinance 2952, § 6.
The severability clause here states that if an application of the Ordinance “to any person, entity, or circumstance” is invalid, the invalidity does not affect any other application “that can be given effect without the invalid application.” Not only that, but by incorporating a reference to the City’s general ordinance governing sever-ability, Section 1-12, the Ordinance manifests a clear intent that even general City regulations should not be allowed to undermine its effectiveness. The severability clause emphasizes the City Council’s determined attempt to maintain whatever part of the Ordinance is valid.
Contrary to the Higginson opinion, the Ordinance’s primary purpose is to effectuate licensing of apartment and single family rentals under the supervision of the building inspector. The requirements pertinent to obtaining and maintaining residential occupancy licenses are carefully spelled out. The “Offenses” that constitute violations of the Ordinance are, first and foremost, grounds for civil enforcement by the building inspector, who can suspend a landlord’s rental license and prevent rent collection during the suspension period based on the violations. Id. §§ l(D)(5)-(8), 3(D)(5)-(8). The building inspector may also revoke a residential occupancy license, forcing the renter’s removal from the premises. Id. §§ 1(D)(4), 3(D)(4). These are effective, stand-alone enforcement measures. Although the City might find criminal enforcement measures desirable, they are not necessary to assure substantial local compliance. Licenses could still be revoked, under a regulatory regime, without bringing criminal prosecutions to bear.[27] Put in terms of Texas *584 severability law, the invalidity of any Class C misdemeanor measure does not prevent the building inspector from carrying out his duties, providing licenses, making “unlawful status” inquiries to the federal government, and shutting down the leasing of single-family dwellings or apartments to non-compliant renters.
No other functional analysis of the Ordinance makes sense. By analogy, if driving without a license were judicially disapproved as a Class C misdemeanor offense, Texas could still require drivers to qualify for and carry licenses, on penalty of civil suspension for violations. As a further analogy, a court could judicially excise criminal environmental violation penalties, but withholding licenses to store or dispose of regulated substances would remain an effective sanction. Regarding the Farmers Branch licensing scheme as unworkable without its criminal enforcement provisions, in sum, views the Ordinance through the wrong end of the telescope. Texas’s strong policy favoring severability compels severability, if this court finds the “criminal” enforcement provisions constitutionally infirm.
D. Judicial-Review Provision
We agree with Judge Higginson in one respect: federal law preempts the aspect of the judicial review section that “allows state courts to assess the legality of a non-citizen’s presence absent a ‘preclusive’ federal determination.” Higginson Op. at 536. The judicial review portion of the Ordinance, as enacted, allows a state court to review whether the occupant is lawfully present, while giving the federal determination “a rebuttable presumption as to the individual’s immigration status” and making conclusive only those federal determinations that “would be given preclusive effect on the question.” §§ 1(E)(4) & (5), 3(E)(4) & (5). Authorizing state courts to revisit federal determinations of immigration status opens the door for conflicting state-federal rulings on an immigrant’s lawful status. This creates an obstacle to Congress’s setting out “the sole and exclusive procedure” for determining whether an alien may be admitted or removed from the United States. 8 U.S.C. § 1229a(a)(3). Therefore, the specific provisions of the judicial review section that authorize state courts to revisit federal determinations of immigration status are conflict preempted by federal law.
We disagree, however, with Judge Higginson’s conclusion that the preempted aspects of the judicial review section are not severable.
Based on the Texas authorities cited in the preceding Section, we must determine whether the Ordinance — without the portion of the judicial review section that allows state courts to revisit federal determinations of immigration status — is “complete in itself, and capable of being executed in accordance with the apparent legislative intent.” Rose, 801 S.W.2d at 844. Here, because the Ordinance contains a severability clause, the legislative intent to sever the unconstitutional portion of the Ordinance is clear. The only *585 question is whether the remaining Ordinance is “complete in itself.”
To resolve this question, we must consider how the Ordinance will operate without the preempted portions of the judicial review section. After deleting the conflict-preempted portions, the judicial review section of the Ordinance, in relevant part, provides:
(4) In a suit for judicial review in which the question of whether the occupant is lawfully present in the United States is to be decided, that question shall be determined under federal law. In answering the question, the court shall be bound by any conclusive determination of immigration status by the federal government. A determination is conclusive if,-under federal-law, -ii-would-be given preclusive effect on the question.
(5) The court shall take judicial notice of any verification of the citizenship or immigration status of the occupant previously provided by the federal government. The court may, at the request of any party shall, request the federal government to provide, in automated, documentary, or testimonial form, a new verification of the citizenship or immigration status of the occupant pursuant to Title 8, United States Code, Section 1373(c). -The-most recent-determination of-the immigration status of an individuab4>y-the-federal ■ government shall create-a-rebuttable presumption as to the individual-s-immigratioB-statuSv
Ordinance 2952, §§ 1(E), § 3(E) (alterations added). The remaining part of the Ordinance’s judicial review section provides that a state court is bound by the determination of immigration status by the federal government. Pursuant to the terms of the Ordinance, judicial review of “the question of whether the occupant is lawfully present in the United States” occurs only if a landlord or occupant has received a deficiency or revocation notice. Id. Such notices are issued only after the “federal government reports the status of the occupant as an alien not lawfully present in the United States.” Id. §§ 1(D), 3(D). Accordingly, any time judicial-review proceedings are initiated, the existing federal determination will bind the state court and it will be unable to make an independent determination of an individual’s immigration status.[28] Without the conflict-preempted language, the Ordinance confines the state judicial inquiry to the federal determination, so there is no conflict between state and federal law as to whether an occupant is “lawfully present.” See Whiting, 131 S.Ct. at 1981. Again— and contra Judge Higginson’s contentions — if there is no conclusive determination from the federal government on the question, no license will be revoked.
Because the preempted portions of the judicial review section can be removed from the Ordinance without impairing any other aspect of the Ordinance, including the ability to seek judicial review of a deficiency or removal notice, the Ordinance remains “complete in itself, capable of execution in accord with the legislature’s intent.” Rose, 801 S.W.2d at 844. Therefore, the preempted portions of the judicial *586 review section can be severed, leaving a valid law.
Y. Conclusion
This case presents a narrow legal issue: whether federal law preempts the Ordinance. The answer under well-established law is straight-forward: it does not. The three opposing opinions reach a different conclusion based on (1) a failure to afford the Ordinance (as a local housing regulation within the police power) the presumptive constitutionality that it deserves; (2) broad and unsupported constructions of Supreme Court precedent, (3) misconceptions about how the Ordinance operates, and (4) contrived conflicts between the Ordinance and federal law. Furthermore, even if one accepts the Higginson opinion’s conflict-preemption analysis, that opinion falters in its final step because the judicial review and criminal enforcement provisions are severable under Texas law. For these reasons, we respectfully dissent.

. While the application requires potential renters to provide general information such as name, address, date of birth, and country of citizenship, there is no affirmative obligation to declare that one is lawfully present prior to receiving a valid occupancy license. See Farmers Branch, Tex., Ordinance 2952, §§ 1(B)(5)®, 3(B)(5)®.

. "The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." 8 U.S.C. § 1373(c).

. A renter may, however, commit an offense if he: (1) occupies a leased or rented apartment before obtaining a residential occupancy license, id. §§ 1(C)(1); 3(C)(1); (2) knowingly makes a false statement of fact on a residential occupancy license application, id. §§ 1(C)(2); 3(C)(2); or (3) creates, possesses, sells, or distributes a counterfeit residential occupancy license, id. §§ 1(C)(3); 3(C)(3).

. "[S]ome Members of the Court have criticized the Salerno formulation,” Wash. State Grange, 552 U.S. at 449, 128 S.Ct. at 1190 (citation omitted), and the Court has also analyzed facial challenges by asking whether a statute has a "plainly legitimate sweep.” Washington v. Glucksberg, 521 U.S. 702, 739-40 & n. 7, 117 S.Ct. 2302, 2304-05 & n. 7, 138 L.Ed.2d 772 (1997) (Stevens, J., concurring in the judgments) (citation omitted). In United States v. Stevens, the Court declined to *565 determine which formulation of the standard is correct. See 559 U.S. 460, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010). Although we note this disagreement, the Supreme Court has not overruled the Salerno standard; to the contrary, the Court has continued to recite it. See, e.g., id. Therefore, the Salerno. standard remains valid precedent, binding on us in this case.

. Judge Reavley’s opinion implies invidious discrimination, but such issues were not decided by the trial court and remain pending.

. The Dennis opinion suggests that the unilateral enforcement policy of the Executive Branch might preempt the Ordinance, a proposition squarely rejected by the Supreme Court in Arizona. See Dennis Op. at note 3 and accompanying text.

. Keller concluded: "Laws designed to deter, or even prohibit, unlawfully present aliens from residing within a particular locality are not tantamount to immigration laws establishing who may enter or remain in the country.” Keller v. City of Fremont, 719 F.3d 931, 941, 2013 WL 3242111, at *5 (8th Cir. June 28, 2013). Further, "[t]he rental provisions do not remove aliens from this country (or even the City), nor do they create a parallel local process to determine an alien’s removability. Accordingly, they do not regulate immigration generally or conduct in the 'field' of alien removal.” Id. at 942, 2013 WL 3242111, at *6.

. In Plyler, this court held the Texas statute not preempted, but found it to violate the equal protection clause. Doe v. Plyler, 628 F.2d 448, 449-50 (5th Cir.1980). The Supreme Court upheld the latter holding without ruling on the preemption decision, which remains the law of this circuit.

. If the parties in DeCanas agreed on anything, it was that both the intent and effect of Section 2805 were to discourage illegal immigration in California. California passed the law, Petitioners explained, "to diminish the impact of the seemingly unstemmable flow of illegal aliens.” Brief of Petitioners at 5, DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (No. 74-882). In no uncertain terms, "[t]he underlying purpose of [Section] 2805 is a state labor policy designed to protect California wage-earners. It seeks to curtail the influx of illegal entrants” by "focus[ing] directly on the source of the problem, namely the hiring practice of local employers.” Id. at 16. Respondents concurred: "[t]he ultimate objective of [Section 2805] is to expel all ‘aliens not entitled to lawful residence’ from California.” “Section 2805 ... seeks to control immigration into the State of California ... by seeking to abolish their employment opportunities.” Brief of Respondents at 6, DeCanas v. Bica, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976) (No. 74-882). It is unfathomable that the Supreme Court would uphold the law in DeCanas if the intent and effect of discouraging illegal aliens were sufficient to transform a law into a "regulation of immigration.”

. The scope of the proscription on "harboring” illegal aliens will be considered in the next section.

. The government as amicus in this case explains that the Department of Homeland Security has established several programs tailored to particular types of inquiries pursuant to § 1373.

. The implied preemption analysis received only four votes, as Justice Thomas joined the rest of the opinion and concurred in the judgment. Whiting, 131 S.Ct. at 1973. Justice Thomas has previously expressed disagreement with implied preemption jurisprudence more generally. See, e.g., Wyeth v. Levine, 555 U.S. at 583, 129 S.Ct. at 1205 (Thomas, J., concurring in the judgment) ("I write separately, however, because I cannot join the majority’s implicit endorsement of far-reaching implied pre-emption doctrines. In particular, I have become increasingly skeptical of this Court’s ‘purposes and objectives’ preemption jurisprudence. Under this approach, the Court routinely invalidates state laws based on perceived conflicts with broad federal policy objectives, legislative history, or generalized notions of congressional purposes that are not embodied within the text of federal law. Because implied pre-emption doctrines that wander far from the statutory text are inconsistent with the Constitution, I concur only in the judgment.”).

. A red-herring variant of this conflict preemption argument is that the Ordinance’s use of the term “alien unlawfully present in the United States" is either inconsistent with federal law or impossible to define. The district court rejected this argument, Villas at Parkside Partners v. City of Farmers Branch, Tex., 701 F.Supp.2d 835 (N.D.Tex.2010), and so do we. The term "lawfully present” is used in a number of federal statutes. See, e.g., 8 U.S.C. §§ 1229a(c)(2); 1357(g)(10); 1182(a)(9)(B)(i)(II); 1621(d); 1623; 42 U.S.C. §§ 1436(a)(3); 1436(a)(5); 1437y; 4605; 26 U.S.C. § 3304; 7 U.S.C. § 2015(f); see also Patient Protection and Affordable Care Act, Pub.L. 111-148, 124 Stat. 119 (2010), at §§ 1411 (c)(2)(B)(ii)(II); 1402(e)(2); 141 l(c)(2)(B)(i)(l). Clearly, this term, used in federal laws ranging from (a) the provision of immigrant status information to local government entities to (b) the status determinations themselves to (c) the denial of various federal benefits and qualification for the newly enacted Affordable Care Act, must have a federal meaning. See also 21 C.F.R. § 478.11, (defining "alien unlawfully in the United States”). The Ordinance uses this common federal term rather than a potentially confusing or conflicting local definition for the illegal aliens that it seeks to exclude from possessing rental licenses.

. The existence of a federal savings provision for state "licensing” laws furnished an analytical part, but not the whole or decisive reasoning, why the Court held the Arizona licensing regulation not to be conflict-preempted. See generally Whiting, 131 S.Ct. 1968.

. See Ordinance 2952, §§ 1(C)(1), 3(C)(1) (“It shall be an offense for a person to be an occupant of a leased or rented apartment without first obtaining a valid occupancy license permitting the person to occupy that apartment.” (emphasis added)); Id. §§ 1(B)(1), 3(B)(1) (“Prior to occupying any leased or rented apartment, each occupant must obtain a residential occupancy license.” (emphasis added)).

. If a renter does not apply for a residential occupancy license, the City is never prompted to determine whether the renter is unlawfully present in the United States. In this circumstance, if the City fines the renter (i.e., imposes criminal liability) for the lack of a valid occupancy license, then the fine is solely for the failure to obtain a license — the renter’s lawful or unlawful status is both unknown and completely irrelevant.

. Of course, to the extent a renter makes a false statement of fact on his application, such as providing a false name, the renter may later be deemed to have committed an offense. See Ordinance 2952 §§ 1(C)(2), 3(C)(2).

.Judge Higginson contends that the Ordinance penalizes an "ongoing condition” and, therefore, a tenant commits an offense at any time he is an occupant without a valid occupancy license. Higginson Op. 532 n. 10. While he suggests that our reading of the Ordinance is "strained,” his construction of the Ordinance would read the words "first obtaining” out of the Ordinance. Specifically, Judge Higginson's reading would be accurate if the Ordinance read; "It shall be an offense for a person to be an occupant of a leased or rented apartment without first -obtaining a valid occupancy license permitting the person to occupy that apartment.” §§ 1(C)(1) & 3(C)(1) (alteration added). Construing the Ordinance in this manner, however, renders the words “first obtaining” superfluous. See, e.g., Duncan v. Walker, 533 U.S. 167, 174, 121 S.Ct. 2120, 2125, 150 L.Ed.2d 251 (2001) (“[A] statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.” (internal quotation marks omitted)).

. The Eleventh Circuit recently concluded that an Alabama statute that criminalized "harboring an unlawfully present alien by entering into a rental agreement with that alien” was conflict-preempted by § 1324. United States v. Alabama, 691 F.3d 1269, 1285 (11th Cir.2012), cert. denied 569 U.S. -, 133 S.Ct. 2022, 185 L.Ed.2d 905 (2013) (No. 12-884). Alabama did not seek review of the Eleventh Circuit's ruling on the rental provision. See Petition for Writ of Certiorari, Alabama, 569 U.S. ——, 133 S.Ct. 2022 (No. 12-884), at 10.
It is inappropriate to apply the logic of Alabama to this case for two reasons. First, even if one believes that the state cannot prohibit the exact conduct as the federal government so long as immigration is involved, an anti-harboring statute is about the "harborer,” not the illegal alien. It is not a regulation of immigration except indirectly in that it forecloses an illegal means that could assist illegal aliens in staying in the United States. This is quite different from the legal discretion of the government to allow some illegal aliens to remain in the United States. Second, although the Eleventh Circuit concluded that the Alabama statute was conflict-preempted by § 1324, it acknowledged that the rental provision did not penalize the same conduct as § 1324. Alabama, 691 F.3d at 1285, 1288. Instead, it concluded that the rental provision was problematic because it "effectuates an untenable expansion of the federal harboring provision.” Id. While we disagree with the Eleventh Circuit’s conclusion that a state law is conflict-preempted merely because it criminalizes conduct that federal law does not, as discussed infra, we similarly find that the Ordinance does not penalize the same conduct as § 1324.

. The four elements of a harboring violation are defined as: (1) an unlawfully present alien; (2) that the defendant conceals, harbors, or shelters; (3) while knowing or recklessly disregarding that the alien in unlawfully present; and (4) in a way that substantially facilitates the alien remaining in the United States. United States v. Shum, 496 F.3d 390, 391-92 (5th Cir.2007).

. The Odebrecht case relied on by the Higginson opinion is inapposite. Odebrecht Const., Inc. v. Sec., Fl. Dept. of Transp., 715 F.3d 1268 (11th Cir.2013). Odebrecht held that Florida's recent statute (the "Cuba Amendment”) preventing companies that do business with Cuba from bidding on state public contracts was conflict-preempted by federal law concerning trade with Cuba. The court described at length the extensive, exact, and "nuanced” federal statutes and explicit delegations of Presidential power in this sensitive area of foreign relations. Id. at 1275-78. The court juxtaposed the Florida statute's explicitly broader definitions that revealed an “obvious, direct and apparent conflict between” federal and state law. Id. at 1280. Unlike Odebrecht, the Higginson opinion can point to only one federal criminal statute, the anti-harboring crime, that has anything to do with the "housing” of illegal aliens; there is simply no other direct federal immigration law or policy on this subject. And as we have shown, there are no obvious and direct conflicts with this single statute. For this reason, the Higginson opinion's reliance on Crosby v. Foreign Trade Council, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (overturning a Massachusetts statute preventing trade with Burma), is also misplaced.

. In DeCanas, the Court remanded for further consideration of such issues as whether the state law defined unauthorized aliens in conflict with federal law. The Court held that California courts should decide in the first instance whether and to what extent the state law, enforced with appropriate regulations, might conflict with federal laws. DeCanas, 424 U.S. at 364-65, 96 S.Ct. at 940-41. The Higginson opinion displays no such deference.

. Judge Higginson claims 8 U.S.C. § 1229(a)(l)(F)(i) — requiring aliens to have an address at which to receive removal paperwork — is evidence that the Ordinance "obstructs the goal of bringing potentially removable non-citizens to the attention of the federal authorities.” This conclusion does not logically flow from the § 1229(a)(1)(F)(i) requirement. Setting aside the fact that the address does not have to be housing owned or rented by the alien in question, once an alien is subject to removal proceedings, the federal authorities are obviously aware of the alien’s presence. Moreover, aliens who are unlawfully present but are not yet the subject of removal proceedings have no requirement to provide an address to the Attorney General. It is odd to suggest that the Ordinance— which potentially alerts the federal government to the presence of unlawfully present aliens that are not the subject of removal proceedings, see Ordinance 2952 §§ 1(B)(7), 3(B)(7) — somehow obstructs the federal removal power. Higginson Op. at 529-30.

. We note again our disagreement with Judge Higginson’s suggestion that an individual may be detained under the Ordinance for being "unlawfully present.” Even if this flawed reading is accepted, it is not fatal to the Ordinance.

. There is also rich irony in the Higginson opinion’s assertion that "unlawful presence” is too vague to allow enforcement of the Ordinance consistent with federal immigration law. If this were true, it would be hard to see how the federal government could prosecute violations of the federal anti-harboring felony statute. The anti-harboring crime, as earlier noted, applies if a defendant knowingly, or with reckless disregard, harbors or conceals an alien who is “in the United States in violation of law.” If a building inspector cannot rely on two inquiries of the federal government for a determination of "unlawful presence,” how could the federal government prove beyond a reasonable doubt that a harborer knew or recklessly disregarded aliens’ status as immigration law violators? Just as no one seriously asserts the vagueness of the anti-harboring felony, so should the assertions of vagueness in the Ordinance's "unlawful presence” determination fail.

. Judge Dennis asserts that we should not consider the Ordinance’s severability clause because the City failed to raise it throughout these proceedings. As a factual matter, Judge Dennis is incorrect. The City’s en banc brief observed that the Ordinance contains a sever-ability clause and described its impact on our review. See Appellant's En Banc Br. at 13. Waiver is also inappropriate here because the impact of the severance clause is a pure question of law. As such, it falls within the "well-settled discretionary exception to the waiver rule [that] exists where a disputed issue concerns ‘a pure question of law.’ ” New Orleans Depot Servs., Inc. v. Dir., Office of Worker’s Comp. Programs, 718 F.3d 384, 388 (5th Cir.2013) (en banc) (quoting Texas v. United States, 730 F.2d 339, 358 n. 35 (5th Cir.1984)).
More importantly, applying our waiver doctrine where the text of the Ordinance itself includes the severance language at issue is deeply problematic. We must give effect to every word of a statute, regardless of whether a litigant draws our attention to the applicability of a particular statutory provision. See, e.g., Lowe v. SEC, 472 U.S. 181, 207 n. 53, 105 S.Ct. 2557, 2572 n. 53, 86 L.Ed.2d 130 (1985) (”[W]e must give effect to every word that [the legislature] used in the statute.”); United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955) ("It is our duty to give effect, if possible, to every clause and word of a statute.” (internal quotation omitted)).

. That the Ordinance is a complete regulatory scheme absent its criminal provisions can be seen through the language of the statute. *584 The inspector’s suspension action is not premised on a formal "criminal” charge, prosecution, or conviction — even though, as Judge Higginson points out, the suspension is "premised on the landlord having committed an offense.” Higginson Op. at 538. For example, it may be an “offense” for a child to commit a truancy violation, but the child need not be "prosecuted” before school authorities can impose other, lesser penalties on the misconduct. As far as the Higginson opinion is concerned, if all you have is the hammer of criminal law, then every problem is a (criminal) nail. Like most regulatory programs, however, the Ordinance offers both civil and criminal enforcement procedures, and they are not interdependent.

. The only additional evidence that would be allowed under the terms of the Ordinance is a new verification of citizenship or immigration status from the federal government. See Ordinance 2952, §§ 1(E)(5), 3(E)(5). The state court may request the new verification on its own motion, and the state court is required to request a new verification at the request of any party. Id. This ability to seek a new verification of the occupant's citizenship or immigration status — which enables the tenant to confirm the existing federal determination — does not place the Ordinance in conflict with federal law. See Whiting, 131 S.Ct. at 1981 n. 7 ("Giving an employer the chance to show that it did not break the state law certainly does not place the Arizona regime in conflict with federal law.”).